# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.W. WALTER, a deceased minor, and through his successor in interest, LISA WALTER, et al.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                                    Defendants. | Case No.:  3:19-cv-02465-W-BLM<br><br>**ORDER: (1) GRANTING REQUEST FOR JUDICIAL NOTICE [DOC. 13-2]; (2) GRANTING MOTION TO FILE DOCUMENT UNDER SEAL [DOC. 11]; AND (3) GRANTNG-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTION TO DISMISS [DOC. 13]** |

Defendants County of San Diego, Melinda Eichenberg, Joanna Kientz, Fanita Durham, Katherine Manno, and Melissa Castillo move to dismiss the First Amended Complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6).  Along with the motion, Defendants request judicial notice and to file a document under seal.  Plaintiffs T.W. Walter, a deceased minor, and Lisa Walter, his successor in interest, oppose the motion to dismiss.

The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS** the motion to seal [Doc. 11], and **GRANTS-IN-PART** and **DENIES-IN-PART** the request for judicial notice [Doc. 13-2] and motion to dismiss [Doc. 13].

## I.   BACKGROUND

The following allegations are taken from the First Amended Complaint ("FAC" [Doc. 10]), and to a much more limited extent the certain documents attached to Defendants' Request for Judicial Notice ("RJN" [Doc. 13-2]).

Plaintiff T.W. is a deceased minor who was less than two years old at all times relevant to this matter.[1]  (*FAC* ¶ 8.)  Plaintiff Lisa Walter is T.W.'s mother and his successor in interest.  (*Id.* ¶ 9.)  Defendants are the County of San Diego and five social workers with the San Diego County's Health & Human Services Agency ("HHSA"): Fanita Durham, Melinda Eichenberg, Joanna Kientz, Katherine Manno and Melissa Castillo.  (*Id.* ¶¶ 10–15.)

T.W. was born on November 8, 2016.  (*FAC* ¶ 23.)  Lisa fed him, had him vaccinated, took him to all of his medical checkups, and followed the doctors' recommendations for his care.  (*Id.* ¶¶ 24, 27.)  He had no health issues while under Lisa's custody.  (*Id.* ¶ 28.)  In early 2018, Lisa and T.W. moved in with Lisa's mother, Ruth Walter.  (*Id.* ¶¶ 29, 39.)

In the early morning of June 26, 2018, the San Diego County Sheriff's Department searched Ruth's home and found some drugs.  (*FAC* ¶ 30.)  Although drugs were found, the home was "was not 'riddled' with drugs, and was otherwise safe."  (*Id.*)  Sheriff's seized the drugs and arrested Lisa.  (*Id.* ¶¶ 33, 34.)  Drug testing later confirmed Lisa was not under the influence, and T.W. had not been exposed to nor ingested any drugs.  (*Id.* ¶¶ 31, 37.)  Additionally, T.W. had not been physically harmed in any way, and he was in good health.  (*Id.* ¶¶ 32, 34.)

Defendants Melinda Eichenberg and Joanna Kientz were called to the home.  (*FAC* ¶ 39.)  Lisa requested that Ruth maintain custody of T.W. during her incarceration.  (*Id.* ¶¶ 33, 39.)  Ruth was present, readily willing and available to care for T.W., and no

---

[1] Because several members of the Walter family are involved, the Court will refer to them by their first name to avoid confusion.

criminal charges were filed against her.  (*Id.* ¶¶ 38, 39.)  The social workers denied Lisa's request and instead decided to remove T.W. without obtaining a court order.  (*Id.* ¶ 40.)

T.W.'s case was assigned to Defendants Fanita Durham and her supervisor, Katherine Manno.  (*FAC* ¶ 46.)  The day after his removal, while in the County's custody, T.W. suffered a serious laceration to his chin and was taken to Rady Children's Hospital for treatment.  (*Id.* ¶ 43.)  A physical exam confirmed T.W. was up to date on his vaccines, healthy, well-developed, and well-nourished.  (*Id.* ¶ 44.)  Lisa was not notified of T.W.'s injury or treatment for several weeks.  (*Id.* ¶ 45.)

As soon as Lisa was released from jail, she contacted Durham seeking to reunite with T.W.  (*FAC* ¶ 48.)  Durham told Lisa that "no matter" the circumstances she "never returns any child earlier than six months—ever." (*Id.* ¶ 49.)  She also refused to refer Lisa to any programs or services, and refused to listen to Lisa's suggested alternatives to leaving T.W. in foster care, such as ensuring Ruth and T.W. lived alone.  (*Id.* ¶¶ 49, 50.)

Throughout July, Lisa was not allowed to see T.W., but actively participated in court-ordered reunification services.  (*FAC* ¶¶ 48–51.)  Lisa repeatedly requested that T.W. be placed with Ruth, but Durham and Manno refused.  (*Id.* ¶¶ 50, 55.)  Instead, they told Lisa that the only acceptable relative placement was Lisa's 19-year old niece, Genevieve Walter, who lived 100 miles away in Long Beach, California.  (*Id.* ¶ 56.)

On July 25, 2018, the Juvenile Court followed Durham and Manno's recommendation and ordered T.W. placed with Genevieve, 100 miles away in Long Beach.  Genevieve did not have children and, at the time, had been living with her partner in a home daycare facility for approximately six months.  (*FAC* ¶ 57.)  Neither Durham nor Manno performed an assessment to ensure this was the best or safest placement for T.W.  (*Id.* ¶ 56.)  Lisa acquiesced to the placement because—based on her interactions with Durham and Manno—Lisa feared being branded as "uncooperative" if she objected.  (*Id.* ¶ 58.)  The Juvenile Court judge also questioned the placement and expressed concern placing T.W. outside San Diego County.  (*Id.* ¶ 59.)  The significant distance and travel time posed problems in scheduling regular visits for Lisa and T.W.  (*Id.* ¶ 60.)

3

Despite placing T.W. with a 19-year old living outside the County, Durham and Manno failed to establish health insurance or provide any means for T.W. to receive and pay for medical care while in Genevieve's custody. (*FAC* ¶¶ 61, 62.) And Genevieve's repeated requests for insurance for T.W. were ignored. (*Id.* ¶ 62.) Durham and Manno also failed to conduct regular visits to ensure T.W.'s placement was appropriate. Durham only visited T.W. once during the placement, on August 29 for five minutes. (*Id.* ¶ 73.)

Lisa had her first visit with T.W. on August 18 and found that he did not "look well" and Lisa became concerned about his health. (*FAC* ¶ 65.) Lisa told Genevieve to take him to the doctor and Genevieve agreed to do so the next day. (*Id.* ¶ 66.) Lisa then tried multiple times to get in contact with Durham regarding T.W.'s health issues, but Durham never returned Lisa's calls. (*Id.*).

Lisa continued participating in reunification services and on August 27, 2018, the Juvenile Court issued an order granting Durham and Manno the discretion to return T.W. to Lisa's care on a sixty-day trial basis. (*FAC* ¶¶ 68, 69, 70.) But Durham and Manno refused to return T.W. to Lisa. (*Id.* ¶ 71.)

On September 11, Genevieve took T.W. to Los Alamitos Medical Center because he was repeatedly vomiting. (*FAC* ¶ 74.) The doctor examined T.W., ran blood tests, placed him on an I.V. and a catheter, administered medication, and set up a follow-up appointment. (*Id.*) While driving home, T.W. began vomiting again so Genevieve took him to the Long Beach Memorial Medical Center Emergency Room. (*Id.* ¶ 75.) After waiting for several hours without being seen, Genevieve left with T.W. (*Id.*) Genevieve continued to attempt to contact Durham throughout the ordeal but received no response. (*Id.* ¶¶ 74, 75.) When Genevieve took T.W. back to the doctor for his follow up visit, she was turned away because T.W. still did not have health insurance. (*Id.* ¶ 76.)

On or about September 17, Genevieve and her partner got into an argument with her partner's grandmother, and the grandmother evicted them. (*FAC* ¶ 79.) Around the same time, T.W.'s case was transferred from Durham to Defendant Melissa Castillo. (*Id.* ¶ 80.) On September 21, Castillo visited T.W. and Genevieve. (*Id.* ¶ 81.) At the time,

Genevieve, her partner and T.W. were homeless and living out of Genevieve's car in a park in Long Beach.  (*Id.*)  T.W. looked "pretty bad," had dark circles under his eyes and bruises on his head and face.  (*Id.*)  Defendants failed to inform Lisa about T.W.'s changed living situation.  (*Id.* ¶ 83.)

The day after Castillo visited T.W., Genevieve placed T.W. in the back seat and started smoking marijuana with her partner in the car.  (*FAC* ¶ 85.)  At some point, Genevieve noticed T.W. had gone limp in his car seat and stopped breathing.  (*Id.*)  Two bystanders performed CPR, and EMS transported T.W. to Long Beach Memorial Hospital.  (*Id.*)  T.W. could not be revived.  (*Id.* ¶ 85.)  He was ruled to have died under "mysterious circumstances" and the autopsy report stated he had bruises on his face and behind his ear.  (*Id.* ¶ 87.)  Defendants failed to notify Lisa of T.W.'s death.  (*Id.* ¶ 88.)  Instead, she was told much later by a friend.  (*Id.*)

In October, Lisa was not allowed to retrieve T.W.'s body because Castillo, Manno, and the County ordered the coroner not to release his body to Lisa.  (*FAC* ¶ 92.)  And although Lisa wanted to burry T.W., Defendants arranged for his funeral and had him cremated.  (*Id.* ¶ 94.)  Durham and Castillo then attended T.W.'s funeral over Lisa's objections.  (*Id.* ¶ 95.)

On October 10, 2019, Plaintiffs filed this lawsuit in the San Diego Superior Court.  On December 20, 2019, Defendants removed the case to this Court.  After Plaintiffs filed the FAC, Defendants moved to dismiss the case.

## II.   REQUEST FOR JUDICIAL NOTICE & TO FILE DOCUMENTS UNDER SEAL

On a motion to dismiss, a court may take judicial notice of undisputed "matters of public record," but not of disputed facts stated in public records.  Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001).  Courts may also "consider materials incorporated into the complaint or matters of public record" under the "incorporation by reference" doctrine.  Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010) (citation omitted).  Such documents include situations where "the complaint necessarily

relies upon a document or the contents of the document are alleged in a complaint" and the document is authentic.  Id.  Finally, a court may take notice of proceedings in other courts "if those proceedings have a direct relation to matters at issue."  U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992).

Here, Defendants request judicial notice of: (1) state-court minute orders from *In the Matter of T.W.—a minor*, Petition No. EJ004288 ("Exhibit A"); (2) a criminal complaint, minute orders, and guilty plea in People of the State of California v. Lisa Ann Walter, Case No. CE382369-03 ("Exhibit B"); (3) T.W.'s autopsy report from the Los Angeles County coroner's department ("Exhibit C"); and (4) Plaintiffs' Government Tort Claim and a declaration from Brent Barnes ("Exhibit D").  (*RJN* [Doc. 13-2] 1:27–2:11.) Plaintiffs object on the basis that Defendants attempt to cite disputed facts contained in above documents.

With respect to Exhibits A, C and D, the Court finds the documents are properly the subject to judicial notice, and are appropriate for the limited purpose of, for example, establishing an autopsy was conducted on T.W. and that juvenile dependency proceedings were filed.  The Court agrees, however, that facts contained in those documents are not properly the subject of judicial notice and thus will not be considered in evaluating the issues raised in Defendants' motion.  Lee, 250 F.3d at 690.  Similarly, the Court agrees that Exhibit B does not have a direct relation to the issues raised in the motion and therefore will deny judicial notice of that exhibit.

Defendants also seek to file Exhibit A to the Request for Judicial Notice under seal on the basis that the exhibit contains sensitive, statutorily protected information regarding juvenile dependency proceedings.  (*Mot. to Seal* [Doc. 11] 1:26–28.)  Plaintiffs do not oppose the request.  Good cause appearing, the Court will grant this request.

### III.   LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6)

tests the legal sufficiency of the complaint.  See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory.  Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party."  Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007).  The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  See Papasan v. Allain, 478 U.S. 265, 286 (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

## IV.   DISCUSSION

Plaintiffs allege five federal causes of action and five state-based causes of action. The Court will evaluate the federal causes of action first.

### A.   Fourth and Fourteenth Amendment Warrantless Seizure Claim

Plaintiffs allege Eichenberg and Kientz violated their right to familial association guaranteed under the Fourth and Fourteenth Amendments based on their conduct in "removing, detaining, and continuing to detain T.W. from the care, custody, and control of his mother and grandmother . . . ."  (FAC ¶ 165.)  Eichenberg and Kientz argue they

are entitled to qualified immunity because Plaintiffs failed to allege a constitutional violation in seizing T.W. and, even if they have, the right allegedly violated was not clearly established.  (*P&A* [Doc. 13-1] 7:13–8:11.)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  <u>Id.</u>  A public official is entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional right. [Citation omitted.]" <u>Id.</u> at 232.

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step approach to evaluating qualified immunity.  First, the court must decide if the facts make out a violation of a constitutional right.  <u>Id.</u> at 201.  If so, the second step is whether the right at issue was "clearly established" at the time of the official's alleged misconduct. <u>Id.</u>  Whether the governing law was clearly established and whether specific facts constitute a violation of established law are legal determinations.  <u>Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.</u>, 237 F.3d 1101, 1106 (9th Cir. 2001).

### 1.    Were Plaintiffs' constitutional rights violated?

The liberty interest "at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."  <u>Troxel v. Granville</u>, 550 U.S. 57, 65 (2000). "Parents and children have a well-elaborated constitutional right to live together without governmental interference."  <u>Wallis v. Spencer</u>, 202 F.3d 1126, 1136 (9th Cir. 2000). "[T]he Fourteenth, First, and Fourth Amendments provide a guarantee 'that parents will not be separated from their children without due process of law except in emergencies.'"

<u>Keates v. Koile</u>, 883 F.3d 1228, 1236 (2018) (citing <u>Mabe</u>, 237 F.3d at 1107–09). The same legal standard applies in evaluating parents' claims under the First and Fourteenth Amendment and children's claims under the Fourth Amendment. <u>Id.</u> at 1236. Under this standard,

> [o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

<u>Wallis</u>, 202 F.3d at 1138 (citation omitted). In <u>Rogers v. Cty. of San Joaquin</u>, 487 F.3d 1288, 1294 (9th Cir. 2007), the Ninth Circuit explained that imminent danger means the social workers "must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." <u>Id.</u> at 1294 (citation omitted). "When social workers . . . can reasonably obtain a warrant without significantly risking serious bodily harm to the child in question, the Fourth Amendment mandates that they do so." <u>Kirkpatrick v. Cty. of Washoe</u>, 843 F.3d 784, 791 (9th Cir. 2016). In <u>Kirkpatrick</u>, for example, the court found an infant born to a mother who used methamphetamine throughout her pregnancy was under no immediate threat even if the hospital allowed the mother to go home with her child. <u>Id.</u> at 787, 792.

Here, Eichenberg and Kientz do not dispute they seized T.W. The sole issue is whether they had reasonable cause to believe T.W. was in imminent danger of serious bodily injury in the time required to obtain a warrant.

Eichenberg and Kientz argue they reasonably believed it was not safe to leave T.W. with Ruth "because the child endangerment and drug raid arose in Ruth Walter's home" and, therefore, she "either approved of, or acquiesced to, the dangers in the home." (*P&A* 6:10–13.) This argument is based on several inferences that are either not supported by the FAC's allegations or contrary to reasonable inferences that must be drawn in Plaintiffs' favor at this stage in the litigation. First, the assertion that there were "endangerments" present in the house is contradicted by the FAC's allegation that the

9

sheriffs searched and seized the drugs, and thus it is reasonable to infer there were no more drugs present in the home.  (*FAC* ¶ 34.)  Additionally, based on the allegation that only Lisa was arrested, it is reasonable to infer that Ruth was not responsible for bringing the drugs into the house.  Moreover, aside from the seized drugs, Defendants never identify any other "endangerments" present in the house and the FAC does not identify any.  In short, the assertion that T.W.'s removal was justified because of purported "child endangerments" present in the house is not supported by the FAC's allegations.[2]

Second, Eichenberg and Kientz's argument is premised on Ruth's alleged approval or acquiescence to the presence of drugs in the house.  The FAC is silent regarding whether Ruth knew about the drugs and there are no allegations relating to where the drugs were found (i.e., hidden or in plain sight).  While it may be reasonable to infer Ruth knew about the drugs since they were in her house, it is equally reasonable to infer she did not.  Because the Court must read all reasonable inferences in favor of the non-moving party, the Court finds Defendants' assertion that Ruth approved of or acquiesced to the presence of drugs in her home is not adequately supported by the FAC.

In addition to the fact that Eichenberg and Kientz's argument is not supported by the FAC's allegations, other allegations indicate T.W. was under no immediate threat of serious physical injury in the time it would have taken to obtain a court order.  The FAC alleges that when Eichenberg and Kientz decided to remove T.W., he "had not consumed any drugs, no drugs were readily available to him, and he had not been physically harmed in any way."  (*FAC* ¶ 32.)  The FAC also alleges T.W. was "in good health, uninjured,

---

[2] Defendants cite three cases supporting the alleged reasonableness of placing T.W. in protective custody.  (*P&A* 6:20–7:4.)  However, each case involved drugs left in areas accessible to children.  See In re Kristin H., 46 Cal. App. 4th 1635, 1651 (1996) (drug paraphernalia left within the four-year-old child's reach); In re Rocco M., 1 Cal. App. 4th 814, 825 (1991) (drugs left in areas accessible to an eleven-year-old child); Hudson v. City of Salem, 2009 WL 1227770, at *25 (D. Or. May 1, 2009) (child suffering continued exposure to second-hand marijuana smoke).  Here, there are no allegations in the FAC indicating T.W. had access to any drugs.

and generally quite healthy." (*Id.* ¶ 34.)  Viewing these facts in the light most favorable to Plaintiffs, Eichenberg and Kientz had no basis to seize T.W. without a court order.

Finally, it is well settled that the scope of the intrusion "must be reasonably necessary to avert that specific injury."  Wallis, 202 F.3d at 1138 (citations omitted).  In California, a parent has a right to arrange for a child's care upon her incarceration.  In re S.D., 99 Cal. App. 4th 1068, 1077–78 (2002).  The burden falls on Defendants to establish Lisa could not arrange for T.W.'s care.  Id. at 1078.

The FAC alleges that when Lisa was arrested, she requested that T.W. be left with his grandmother, who was present, willing and available to care for T.W.  (*FAC* ¶¶ 38, 39.)  Eichenberg and Kientz refused Lisa's request.  Based on these allegations, the Court finds the scope of the intrusion was not reasonably necessary.

### 2.    Was the law clearly established?

Eichenberg and Kientz argue that even if Plaintiffs' constitutional rights were violated, the law was not clearly established when T.W. was seized.  In support of this argument, Eichenberg and Kientz again rely on the assertion that Ruth's home is "where the child endangerment and drug activity occurred."  (*P&A* 8:3–4.)  Based on that premise, they argue that "[g]iven that Lisa's arrest for drug possession and child endangerment arose from conditions that existed in Ruth Walter's home, under these 'particular circumstances,' there was no precedent 'that put Eichenberg and Kientz on clear notice that' their decision to not place TW with Ruth Walter (a grandparent) would be unconstitutional."  (*Id.* 8:4–8.)

Generally, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  Plumhoff v. Rickard, 134 S.Ct. 2012, 2023 (2014).  However, "it is not necessary that the alleged act [itself] be previously declared unconstitutional."  Burke v. Cty. of Alameda, 586 F.3d 725, 734 (9th Cir. 2009) (quotation omitted).  Rather, to be clearly established, "the law must be

sufficiently clear that a *reasonable official would understand that what he is doing violates that right*." Id. (quotation omitted) (emphasis in original).

When T.W. was seized, "it was well-settled that a child could not be removed from his or her parents without prior judicial authorization, absent evidence that the child was in imminent danger of serious bodily injury." Jones v. Cty. of Los Angeles, 722 F. App'x 634, 637 (9th Cir. 2018); see also Demaree v. Pederson, 887 F.3d 870, 883 (9th Cir. 2018) (quotation omitted) (noting that it is "beyond debate that existing Ninth Circuit precedent establishes that children can only be taken from home without a warrant to protect them from imminent physical injury . . . in the period before a warrant could be obtained."). Thus, when the risk to a child "simply does not meet that standard," social workers have no basis for the seizure. Demaree, 887 F.3d at 883.

As discussed above, Eichenberg and Kientz's contention that there were "child endangerments" present at the home is not supported by the FAC's allegations. The FAC alleges the sheriffs removed the drugs from the home, and Eichenberg and Kientz have not identified any other endangerments present when they seized T.W. Nor have Defendants identified any other facts suggesting T.W. was in imminent danger if left with Ruth. Because the law was clear that T.W.'s removal without a court order required objective facts indicating imminent harm, the Court finds the law was clearly established.

## B. Fourteenth Amendment Failure to Protect Claim

The FAC alleges Defendants Durham, Manno, and Castillo violated T.W.'s Fourteenth Amendment rights. (*FAC* ¶¶ 182, 185.) Defendants seek dismissal of this claim on three grounds: (1) absolute immunity; (2) qualified immunity; and (3) the FAC fails to state a claim.

### 1. Absolute immunity.

"[A]bsolute immunity [is] the exceptional case." Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1106 (9th Cir. 2001). It is generally reserved

for judges and prosecutors functioning in their "official capacities."  Tamas v. Dep't of
Social & Health Servs., 630 F.3d 833, 842 (9th Cir. 2010) (quotation omitted).  In
evaluating absolute immunity, courts examine "the nature of the function performed, not
the identity of the actor who performed it."  Id. (quotation omitted).

Social workers enjoy absolute immunity when performing "quasi-prosecutorial and
quasi-judicial functions" such as execution of a court order.  Tamas, 630 F.3d at 842
(citation omitted).  They are not entitled to absolute immunity for "investigatory conduct,
discretionary decisions or recommendations."  Id. (citation omitted).  This includes, for
example, "decisions and recommendations as to the particular home where a child is to
go or as to the particular foster parents who are to provide care."  Miller v. Gammie, 335
F.3d 889, 898 (9th Cir. 2003).  "Even actions taken with court approval or under a court's
direction are not in and of themselves entitled to . . . absolute immunity."  Id. at 897.

Defendants argue they are entitled to absolute immunity because they "merely
executed a valid court order that specifically required" T.W.'s placement with Genevieve.
(P&A 13:9–10.)  However, the FAC alleges "Durham and Manno told Lisa that . . .
Genevieve . . . was the only acceptable placement" for T.W.  (FAC ¶ 56.)  From this
allegation, it is reasonable to infer that Manno and Durham recommended T.W.'s
placement with Genevieve to the juvenile court.  Moreover, the juvenile court order gave
the social workers "discretion" to "detain the minor with a relative/non-relative extended
family member."  (Id. ¶ 69.)  Thus, Durham and Manno are not entitled to absolute
immunity for this conduct.  See Miller, 335 F.3d at 898 (absolute immunity does not
apply to "recommendations as to the particular home where a child is to go").

Defendants also argue removing T.W. from his placement required court approval,
and thus their decision not to remove him is "conduct critical to the judicial process and
is therefore immune."  (Reply 7:6–12.)  But the allegation that the Juvenile Court granted
the social workers discretion to return T.W. to Lisa's care on a sixty day trial basis
contradicts this argument.  (See FAC ¶¶ 69, 71.)  Because T.W.'s continued placement

with Genevieve was the result of the social workers' exercise of discretion, they are not entitled to absolute immunity.

### 2.      Qualified immunity.

### (a)      Were Plaintiffs' constitutional rights violated?

Generally, the Fourteenth Amendment "does not confer any affirmative right to governmental aid," nor does it "impose a duty on the state to protect individuals from third parties." Henry A. v. Willden, 678 F.3d 991, 998 (9th Cir. 2012) (quotation omitted).  There are two exceptions that may give rise to a § 1983 claim: the special-relationship exception and the state-created danger exception.  Id.

The special-relationship exception applies when "a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being." Henry A., 678 F.3d at 998 (citation omitted).  Foster children are owed "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." Id. at 1000 (quotation omitted).  Specifically, "food, clothing, shelter, [and] medical care" must be provided by the state. Id. (quotation omitted).

A state official must act with such deliberate indifference to the liberty interest that their actions "shock the conscience." Tamas v. Dep't of Soc. & Health Serv., 630 F.3d 883, 844 (9th Cir. 2010).  Deliberate indifference "requires (1) a showing of an objectively substantial risk of harm; and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) that a reasonable official would have been compelled to draw the inference." Henry A., 678 F.3d at 1001 (quotations omitted).  The "subjective component may be inferred from the fact that the risk of harm is obvious." Id. (quotation omitted).  Each individual defendant's conduct must be analyzed to ascertain whether it meets the standard.  See Hubbard v. Oklahoma ex rel. Oklahoma Dep't of Human Servs., 759 F. App'x 693, 706 (10th Cir. 2018).

14

Plaintiffs argue Defendants had a custodial relationship with T.W. and failed to provide reasonable safety and minimally adequate care by "failing to follow up, investigate, intervene, or provide services to Genevieve and [T.W.]" (*FAC* ¶¶ 182, 183, 184.) Defendants do not dispute the special-relationship exception applies. Rather, they contend there are no facts establishing T.W. was at "serious risk of harm in [Genevieve's] care" and there are no facts establishing that "each social worker was subjectively aware of facts that demonstrated [T.W.] was at serious risk of harm in [Genevieve's] care." (*P&A* 9:20–23.)

With respect to Durham and Manno, the FAC alleges they placed T.W. with 19-year old Genevieve without providing medical insurance. The FAC further alleges that Genevieve and Lisa repeatedly attempted to contact the social workers regarding the need for insurance and concerns regarding T.W.'s declining health. The social workers allegedly ignored their calls and failed to establish insurance for T.W. Durham only visited T.W. once during the two months he was placed with Genevieve. Meanwhile, T.W.'s health began to decline and he was taken to the hospital at least twice. When Genevieve took him to a follow-up medical visit, they refused to see T.W. because of the lack of insurance. Genevieve and Lisa continued to attempt to contact the social workers, but they ignored their calls. Based on these allegations, the Court finds T.W. has alleged a Fourteenth Amendment violation against Durham and Manno. See Henry A., 678 F.3d at 1000 (failure to provide a foster child with medical care violates the Fourteenth Amendment).

As for Castillo, the issue is much closer given the short amount of time she was assigned to T.W.'s case before he died. Nevertheless, the FAC alleges that when Castillo visited Genevieve and T.W., they were homeless, living out of Genevieve's car in a park in Long Beach, that T.W. did not look well, had dark circles around his eyes, and bruises on his head and behind his ear. The day after the visit T.W. died. At this stage in the litigation, and given that all reasonable inferences must be read in favor of Plaintiffs, the Court finds these allegations sufficient to support a finding that "a reasonable official

would have been compelled to draw the inference" that a substantial risk of serious harm existed for T.W.  Henry A., 678 F.3d at 1001 (quotation omitted).

### (b)  Was the Right Clearly Established?

The relevant inquiry in evaluating whether the right was clearly established is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Tamas, 630 F.3d at 846. (quotation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Henry A., 678 F.3d at 1000 (quotation omitted).

In 1992, the Ninth Circuit held that "[o]nce the state assumes wardship of a child, the state owes the child . . . reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." Lipscomb By & Through DeFehr v. Simmons, 962 F.2d 1374, 1379 (9th Cir. 1992); see also Henry A., 678 F.3d at 1000 (foster children are owed "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child")  The Supreme Court has also recognized that when the State takes a person into its custody "and at the same time fails to provide for his basic human needs [including] . . . medical care[,]" it violates the Due Process clause. DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) (emphasis added); see also Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993) ("it was clearly established in 1991 that the state had an obligation to provide adequate medical care [to foster children]").  In light of this precedent, the Court finds Durham and Manno should have known their failure to provide T.W. with medical insurance, particularly in light of his declining condition, violated T.W.'s Fourteenth Amendment rights.

With respect to Castillo, the Ninth Circuit has explained that "the law does not impose the duty of guarding their own safety on wards of the state.  Rather, that duty is the quintessential responsibility of the social workers assigned to safeguard the well-

being of this helpless and vulnerable population." Tamas, 630 F.3d at 843.  Given the FAC's allegations that when Castillo visited T.W. she found him homeless with bruises on his head, living in a park with 19-year old Genevieve, and without medical insurance, the Court finds Castillo should have known her failure to act was unlawful in light of the clearly established duty social workers owe to foster children.  See Lipscomb, 962 F.2d at 1379 (social workers owe "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child").

### 3. Failure to state a claim.

As discussed above, the Court has determined the FAC alleges a violation of T.W.'s Fourteenth Amendment rights.  Accordingly, Defendants' contention that the FAC fails to state a claim lacks merit.

### C. First Amendment Retaliation Claim

Lisa alleges a First Amendment retaliation claim under 42 U.S.C. § 1983 against Defendants Durham and Manno.  (FAC ¶¶ 222–37.)  Defendants move to dismiss on the grounds that (1) Plaintiff fails to plead a retaliation claim and (2) they are entitled to qualified immunity.  (P&A 14:13–15:26.)

In order to state a First Amendment retaliation claim, the plaintiff must plausibly allege "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." Capp v. Cty. of San Diego, 940 F.3d 1046, 1053 (9th Cir. 2019) (quotation omitted).  A plaintiff must show the "adverse action against the plaintiff would not have been taken absent the retaliatory motive." Id. (quotation omitted).

Defendants argue the FAC fails to plead a retaliation claim because the FAC (1) fails to show they engaged in retaliatory conduct, and (2) their conduct would not chill the exercise of Lisa's First Amendment rights.  (P&A 14: 21–15:9.)

The FAC alleges Defendants engaged in retaliatory conduct.  According to the FAC, as a result of Lisa's complaints regarding T.W.'s placement and Defendants' failure to provide her with services, Durham placed T.W. with Genevieve in another county, approximately 100 miles from Lisa.  (*FAC* ¶¶ 56, 57, 228.)  This placement "unduly restricted [her] ability to visit with [T.W.] by placing him in a remote location, knowing that Lisa had no reliable means of transportation or ability to travel for visits." (*Id.* ¶ 228.)  The FAC further alleges "[e]ven the Juvenile Court judge, upon learning of the placement, questioned the Defendants' decision and expressed concern that [T.W.] was placed outside the County of San Diego." (*Id.* ¶ 229.)  Durham and Manno also allegedly conducted themselves in a manner intended to obstruct "Lisa's ability to reunify with her child . . . ." (*Id.* ¶ 230.)  As an example, the FAC alleges that without advance notice, Manno demanded Lisa attend a meeting with her and Durham, which required Lisa to miss a parent case session that was required for reunification with T.W.  (*Id.* ¶ 63.)  When Lisa showed up to the meeting, Manno and Durham cancelled the meeting "without any explanation at all." (*Id.* ¶ 64.)  As a result, Lisa was "unjustly documented as non-compliant with her reunification services plan." (*Id.*)  Lisa alleges Durham and Manno's conduct was intended to interfere with her reunification efforts. (*Id.* ¶ 63.)  The Court finds these allegations allege Defendants engaged in retaliatory conduct.

Defendants' argument that the FAC fails to allege their conduct had a chilling effect on Lisa also lacks merit.  The FAC alleges Lisa initially acquiesced to T.W.'s placement because she feared being branded as "uncooperative" if she objected.  (*FAC* ¶ 58.)  Lisa also contends she "did not feel that she had any choice in the matter, but rather was coerced into silence by Defendants' threatening behaviors." (*Id.* ¶ 230.)

Defendants nevertheless argue that because the FAC alleges Lisa continued to complain about T.W.'s placement and their failure to provide services, Defendants "conduct did not chill Lisa." (*P&A* 15:4–5.)  Although Lisa continued to complain after T.W. was placed with Genevieve, the FAC clearly alleges Defendants' chilled Lisa from objecting about his placement during the juvenile court proceeding.  Moreover, as the

Ninth Circuit has explained, the inquiry is not whether Defendants' actions actually chilled Lisa, "but rather whether the alleged retaliation 'would chill *a person of ordinary firmness* from continuing to engage in the protected activity." Capp, 940 F.3d at 1054. The "threat of losing custody of one's children is a severe consequence that would chill the average person from voicing criticism of official conduct." Id. at 1055.

Defendants also argue "there are no allegations Durham or Manno threatened to terminate Lisa's parental rights." (*Reply* 7:14–17.)  However, such a threat does not have to be explicit.  In Capp, a social worker interviewed a father about unsubstantiated neglect allegations, interviewed his children without his consent, and after the father complained to the agency, advised the children's mother to "seek legal action immediately to keep [the] children safe." Id., 940 F.3d at 1051.  Even though the social worker never explicitly threatened to take the children from the father's custody, the Ninth Circuit found the threat of losing custody was present.  Id.

Here, although the FAC does not explicitly allege Defendants threatened to permanently terminate Lisa's parental rights, the FAC's allegations establish Lisa feared not being reunited with T.W.  According to the FAC, by August 27, 2018, the Juvenile Court issued an order "granting Durham and Manno the discretion to return [T.W.] to Lisa's care on a sixty day trial basis, [but] Defendants would not stop their retaliation." (*FAC* ¶ 233.)  Although "Lisa was doing everything she reasonably could do to avail herself of and participate in reunification services" and Defendants "had no ongoing, legitimate, basis to continue to detain Tyler from Lisa's care," the FAC alleges "Defendants punished Lisa for her constant complaints to both them and the Juvenile Court and continued their efforts to prevent reunification." (*Id.* ¶¶ 234–235.)  Based on allegations such as these, the Court concludes it is reasonable to infer Lisa reasonably believed her parental rights were at stake.  For these reasons, the Court finds the FAC has sufficiently alleged Defendants engaged in retaliatory conduct and their conduct would chill the exercise of one's First Amendment rights

1    The final issue is whether "the right at issue was clearly established at the time of

2    defendant's alleged misconduct." Capp, 940 F.3d at 1058 (quotation omitted).  In Capp,

3    the Ninth Circuit held that it is clearly established that "a government actor could not take

4    action that would be expected to chill protected speech out of retaliatory animus for such

5    speech." Id. at 1059.  Although Capp is a 2019 case, its holding was based on case law

6    predating Durham and Manno's conduct here.  See id.  Because the law was clearly

7    established, Defendants are not entitled to qualified immunity on this claim.

8

9    **D.    Fourteenth Amendment – Disposition of Remains Claim**

10   Lisa alleges a violation of the Fourteenth Amendment based on the usurpation of

11   T.W.'s remains against Defendants Durham, Manno, Castillo, and the County.  (*FAC* ¶¶

12   249–61.)  Defendants move to dismiss arguing Plaintiff fails to plead a substantive due

13   process claim and they are entitled to qualified immunity.  (*P&A* 15:28–17:9.)

14   A "parent's right to control a deceased child's remains and death images flows

15   from the well-established substantive due process right to family integrity." Marsh v.

16   Cty. of San Diego, 680 F.3d 1148, 1154 (9th Cir. 2012) (citing Rosenbaum v. Washoe

17   County, 663 F.3d 1071, 1079 (9th Cir. 2011)).  It is part of the parents' interest "in the

18   care, custody, and control of their children . . . ." Id.  "A parent's right to choose how to

19   care for a child in life reasonably extends to decision dealing with death, such as whether

20   to have an autopsy, how to dispose of the remains, whether to have a memorial service

21   and whether to publish an obituary." Id.

22   The FAC alleges Defendants barred Lisa from retrieving T.W.'s remains, then

23   planned and arranged for T.W.'s funeral, pushed "for [T.W.'s] immediate cremation,"

24   and attended T.W.'s funeral against Lisa's wishes.  (*FAC* ¶¶ 253, 254, 256, 257.)  This

25   alleged conduct interfered with Lisa's parental right to control the physical remains and

26   memory of T.W.  See Marsh, 680 F.3d at 1154.  Moreover, Manno, Castillo and the

27   County's conduct shocks the conscious, particularly the alleged decision to cremate

28   T.W.'s body over Lisa's objection and desire to bury her child.  (*Id.* ¶ 88.)  Based on

these allegations, the Court finds Lisa has stated a Fourteenth Amendment violation against Manno, Castillo and the County.

With respect to Defendant Durham, the only allegation is that she attended T.W.'s funeral. (*FAC* ¶ 95.)  The Court finds this allegation insufficient to satisfy the shocks-the-conscious standard necessary to plead a Fourteenth Amendment violation.

Defendants argue the Los Angeles Coroner controlled and had authority over T.W.'s remains. (*P&A* 16:16–17:2  )  However, the Los Angeles Coroner had custody of the body "until the conclusion of the autopsy or medical investigation." Cal. Health & Safety Code § 7102 (West).  The FAC alleges Defendants ordered the Los Angeles Coroner to refuse to release T.W.'s body to Lisa *after* the autopsy and investigation was concluded. (*FAC* ¶¶ 92, 239.)  Furthermore, as noted above, ordering the Coroner not to release the body to Lisa was only one of numerous actions taken by Defendants in support of this claim.

Having determined Lisa pleads a plausible Fourteenth Amendment substantive due process claim, the issue is whether the right was "clearly established" at the time of Defendants' conduct.  Based on <u>Marsh</u>, 680 F.3d at 1158, the Court finds it was. Accordingly, Manno, Castillo and the County were on notice that their conduct was unlawful.[3]

### E.   <u>Monell liability</u>

Defendants argue the <u>Monell</u> claim should be dismissed because Plaintiffs failed to allege a constitutional violation. (*P&A* 17:10–18.)  Because the Court has found Plaintiffs alleged constitutional violations, the County's argument lacks merit.

---

[3] The parties also argue about whether Lisa has alleged a procedural due process claim.  On a motion to dismiss, the issue is whether the cause of action alleges a claim.  Because the Court has found Lisa alleges a substantive due process claim, it need not address the procedural due process claim.

**F.     Breach of Duty of Due Care Arising Under Special Relationship**

Plaintiffs allege a breach of the duty of due care arising under the special-relationship theory against the County, Durham, Manno, and Castillo.  (FAC ¶¶ 124–140.)  Defendants argue that T.W. fails to allege Defendants' conduct caused his death and Defendants are immune from liability.  (*P&A* 17:25–18:1.)

**1.     Discretionary Immunity**

Under California Government Code § 820.2, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2.  The discretionary act must be a "deliberate and considered" quasi-legislative planning/policy decision rather than a lower-level operational decision that implements a basic policy already formulated.  Caldwell v. Montoya, 10 Cal. 4th 972, 981 (1995) (emphasis in original).  Defendants have the burden of establishing they are entitled to immunity for an actual policy decision made by an employee who consciously balanced the risks and advantages of making the decision.  See A.E. ex rel. Hernandez v. Cty. of Tulare, 666 F.3d 631, 639 (9th Cir. 2012).   Therefore, to succeed on their claim of discretionary immunity, Defendants must prove the decisions were policy decisions and the social workers consciously balanced risks and advantages.

Not surprisingly, there are no allegations in the FAC that support Defendants' claim they are entitled to discretionary immunity.  See A.E., 666 F.3d at 640 ("It would be odd indeed if a plaintiff included in a Complaint allegations that would establish a basis for finding discretionary act immunity on the part of government defendants."). Nonetheless, Defendants contend placement decisions are discretionary under County of Los Angeles v. Superior Court ("Terrell R."), 102 Cal.App.4th 627 (2002).  (*P&A* 18:9–13.)  But as explained by the Ninth Circuit, Terrell R. "sharply departed" from precedent, and the scope of the immunity must be construed as narrowly as possible by distinguishing between the employee's operational and policy decisions.  A.E., 666 F.3d

22

at 639–40.  Thus, in <u>A.E.</u> the court found immunity did not apply for the "allegedly negligent placement and supervision" of a child because defendants failed to establish they "balanc[ed] the risks and advantages. . . ."  <u>Id.</u> at 640.

Defendants also cite <u>Becerra v. County of Santa Cruz</u>, 68 Cal. App. 4th 1450, 1465 (1998), for the proposition that decisions related to supervising a child in a foster home are discretionary.  (*P&A* 18:14–27.)  However, in <u>Becerra</u>, defendants made "a detailed showing" of the balancing of risks and advantages by providing a contact sheet showing extensive telephone contacts and a transcript of a hearing in which a social worker stated she investigated issues with the placement.  <u>Id.</u> at 146.

Defendants' cases confirm that they must establish they consciously balanced the risks and advantages in making a decision.  Thus, Defendants' conclusory statement that their alleged "failure to assess [Genevieve's] home, adequately supervise [T.W.], or investigate abuse" (*P&A* 19:6–11) involve the exercise of discretion is insufficient.  <u>See Johnson v. Cty. of Los Angeles</u>, 143 Cal. App. 3d 298, 313–14 (1983) (noting the balancing standard is not met if defendants merely allege contrary allegations).  For these reasons, Defendants are not entitled to § 820.2 immunity.

### 2.     Failure to state a claim.

Defendants argue the negligence claim fails because "even if T.W. could establish social workers breached a duty," he fails to plausibly allege they caused his death.  (*P&A* 17:26–28.)  In support of this theory, Defendants refer to "Section IV(A)(2)" in their points and authorities.  (*Id.*)  In that section, Defendants assert in conclusory fashion that the "factual allegations do not sufficiently link the Social Worker's conduct (their purported failure to supervise him, and provide services) to TW's death."  (*Id.* 13:1–3, citing "*See generally* FAC.")  The Court disagrees with Defendants.

The FAC alleges that when T.W. was removed from Lisa's custody, he was a healthy, happy child and had no health issues.  (*FAC* ¶¶ 28, 32, 34, 38.)  This was confirmed when T.W. was examined at Rady Children's hospital within a day or two of

23

his removal.  (*Id.* ¶ 44.)  The FAC further details T.W.'s decline while in the County's custody, from a healthy child to one who refused to eat, had bouts of vomiting, was dehydrated and had bruising on his head.  (*Id.* ¶¶ 65, 74, 75, 77, 81, 117.)  All the while, Defendants allegedly failed to monitor T.W., failed to return Lisa and Genevieve's calls about T.W.'s health concerns and failed to provide him with medical coverage.  (*Id.* ¶¶ 66, 76, 77, 117.)  T.W.'s health continued to decline until he died on September 22, 2018.  (*Id.* ¶ 85, 86.)  In short, the FAC alleges Defendants' wrongful acts or failures to act set in motion a chain of events that eventually resulted in T.W.'s death.  At this stage in the litigation, the Court is satisfied that these allegations establish causation.

## G.   **Breach of Mandatory Duties**

Plaintiffs' third claim for relief is a breach of mandatory duties claim.  (*FAC* ¶¶ 141–61.)  Defendants argue none of the enactments cited by Plaintiffs establish mandatory duties.  (*P&A* 20:3–24:12.)

California Government Code § 815.6 contains a three-pronged test for determining whether liability may be imposed on a public entity: (1) an enactment must impose a mandatory, not discretionary, duty; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting § 815.6 as a basis for liability; (3) breach of the mandatory duty must be a proximate cause of the injury suffered.  Cal. Gov't Code § 815.6.  An enactment creates a mandatory duty if it requires a public agency to take a particular action, not if it recites legislative goals and discretionary policies.  Terrell R., 102 Cal. App. 4th at 639.  In order to be mandatory, an enactment must be obligatory, rather than discretionary or permissive, and it must require, rather than merely authorize or permit, that a particular action be taken.  Id.

Plaintiffs allege Defendants violated several mandatory duties established by the California Department of Social Services' Manual of Policies and Procedures ("MPP").  (*FAC* ¶ 144.)  Defendants analyzed some of the enactments to argue they do not rise to

the level of mandatory duties, the duties were not enacted to prevent T.W.'s injuries, and causation did not exist.  (*P&A* 20:3–24:12.)

MPP Regulation 31-405.22 provides: "When arranging for a child's placement, the social worker shall: Monitor the child's physical and emotional condition, and take necessary actions to safeguard the child's growth and development."  Use of the word "shall" indicates a mandatory duty on the part of Defendants to monitor T.W.'s physical condition because it requires a social worker to take a "particular action."  See Terrell R., 102 Cal. App. 4th at 639.  Defendants' assertion that this regulation "does not mandate a specific concrete action" is wrong.  As set forth above, the FAC also sufficiently alleges the social workers failed to monitor T.W.'s deteriorating health, failed to provide health insurance, and ignored repeated phone calls by Genevieve and Lisa regarding T.W.'s ailing health.  The enactment also appears to have been intended to protect T.W.  And Defendants' breach of this duty is a proximate cause of T.W.'s injuries because failing to adequately monitor the physical health of a child plausibly leads to physical harm.  Thus, the Court finds Plaintiffs adequately alleged a breach of Regulation 31-405.22.

MPP Regulation 31-405.24 provides: "When arranging for a child's placement, the social worker shall: Ensure that the child receives medical and dental care which places attention on preventative health services . . . ."  Defendants fail to mention this regulation in their motion.  It establishes a mandatory duty on the part of Defendants to ensure T.W. received medical care.  Because the FAC alleges Defendants failed to provide T.W. with health insurance, which resulted in the denial of his follow-up medical appointment, Plaintiffs adequately alleged a breach of Regulation 31-405.24.

Finally, MPP Regulation 31-445.1 provides: "Prior to the placement of a child in a . . . home, the child welfare agency shall assess the home and the caregiver by completing the following requirements: (.11) An assessment of the prospective caregiver'(s) ability and desire to meet the child's specific needs; (.12) An in-home evaluation of the home to verify the home meets the health and safety standards . . .; (.13) Verification that the proposed caregiver, all adults living in the home and all other non-exempt adults having

routine contact with the child have a criminal record clearance . . . ."  The word "requirements" clearly establishes a mandatory duty.  Although Defendants argue there are no allegations that the home inspection and background check did not occur, the FAC clearly alleges that "neither Durham nor Manno performed an assessment to ensure that Genevieve would be the best placement for [T.W.], or even a safe placement for him." (*FAC* ¶ 56.)  Because the FAC alleges an assessment was not performed, and Plaintiffs' allegations must be accepted as true at this point, Plaintiffs sufficiently alleged a breach of the duty.   Additionally, the regulation's invocation of "health and safety" establishes that it was meant to prevent the harm T.W. endured—loss of health resulting in death.  Thus, the Court finds Plaintiffs adequately alleged a breach of Regulation 31-445.1

At minimum, Plaintiffs have alleged the breach of four mandatory duties, which is more than enough to survive the motion to dismiss.

### H.   Wrongful Death

The FAC alleges a wrongful death claim against the County, Durham, Manno, and Castillo.  The first count proceeds under a breach of mandatory-duties theory (*FAC* ¶¶ 98–112), and the second count is based on a breach of the duty of due care under the special-relationship theory (*id.* ¶¶ 113–123).  Defendants argue the claim fails because Lisa "does not sufficiently allege Social Workers engaged in a negligent or intentional act that caused T.W.'s death" and their conduct was discretionary, so they are immune. (*P&A* 24:14–21.)

The elements of the cause of action for wrongful death are (1) the tort, including negligence or other wrongful act; (2) the resulting death, (3) and damages.  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1263 (2006).

As discussed above, the Court has already found the FAC pleads valid claims for breach of the duty of due care under the special-relationship theory, and breach of mandatory duties.  Accordingly, the Court also finds the FAC pleads a valid wrongful death claim under both counts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      Usurpation of Infant's Remains

The FAC asserts a negligence/ negligence per se usurpation of infant's remains claim by Lisa against County, Durham, Manno, and Castillo.  (*FAC* ¶¶ 238–48.) Defendants argue this claim fails because she failed to comply with the California Tort Claims Act (CTCA).  (*P&A* 24:23–24:14.)

Before suing a public entity, the CTCA requires "the timely presentation of a written claim and the rejection of the claim in whole or in part."  Mabe, 237 F.3d at 1111 (quotation omitted).  Failing to comply with the Act's requirements preclude a plaintiff from bringing suit against an entity.  Hacienda La Puente Unified Sch. Dist. of Los Angeles v. Honig, 976 F.2d 487, 495 (9th Cir. 1992).  The threshold notice requirements of claim submission include the name and address of the claimant; "the date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted"; a general description of the injury, damage or loss; the names of the public employees causing the injury, damage, or loss; and the amount claimed if less than $10,000.  Cal. Gov't Code § 910.

However, a claim "need not contain the detail and specificity required of a pleading but need only 'fairly describe what [the] entity is alleged to have done.'" Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth., 34 Cal. 4th 441, 446 (2004).  In Stockett, the California Supreme Court described the requirement as follows:

> The claim, however, need not specify each particular act or omission later proven to have caused the injury.  [Citation omitted.]  A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an "entirely different set of facts." [Citation omitted.]  Only where there has been a "complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim," have courts generally found the complaint barred. [Citation omitted.]  Where the complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint.  [Citation omitted.]

27

1   Id. at 447.

2       Lisa's CTCA claim alleges "[w]hen I tried to get my son's body from the LA

3   coronors [*sic*] I was not allowed to per coronors [*sic*]."  (*See RJN* Ex. D at 61.)

4   Defendants contend Lisa failed to comply with the CTCA because she only alleges that

5   the Los Angeles coroners refused to relinquish T.W.'s body and not the County or its

6   employees.  (*P&A* 25:5–14.)  Lisa responds that she complied with the CTCA because

7   the FAC "merely adds factual allegations to those in the tort claim."  (*Opp'n* [Doc. 14]

8   24:20–21.)

9       The problem with Plaintiff's argument is her cause of action not only adds factual

10  allegations that are fairly distinct from the refusal to release the body—i.e., ordering T.W.

11  cremated—but it also attributes that conduct to completely different actors.  Whereas in

12  the CTCA claim Lisa attributed the claim to the L.A. Coroner, now she contends the

13  order came from the County, Durham, Manno, and Castillo.  In other words, she now

14  seeks to "premise civil liability on acts or omissions committed . . . by different persons

15  than those described in the claim . . . ."  Moreover, Plaintiffs' opposition fails to offer

16  any explanation for failing to attribute those acts to Defendants in the CTCA claim or in

17  failing to include T.W.'s cremation in the claim.  Under these circumstances, the Court

18  finds Plaintiffs failed to comply with the CTCA with respect to the state-law usurpation

19  of infant's remains claim.

20

21      **J.**      **Intentional Infliction of Emotional Distress**

22      The FAC asserts an intentional infliction of emotional distress (IIED) claim against

23  the County, Durham, Manno, and Castillo.  (*FAC* ¶¶ 262–76.)  Defendants argue the

24  claim fails because she did not show Defendants' conduct caused T.W.'s death,

25  Defendants are immune, and Lisa failed to comply with the CTCA in that she failed to

26  mention any facts surrounding Social Workers' interference with T.W.'s burial.  (*P&A*

27  25:15–22.)

28

A cause of action for IIED requires proof of: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the severe emotional distress." <u>Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.</u>, 39 Cal. App. 5th 995, 1007 (2019).

For the reasons addressed above, the Court finds that Defendants' arguments based on the theory they are entitled to immunity and did not cause T.W.'s death lack merit and, therefore, do not serve as a basis for dismissal of this claim at this point in the litigation. Additionally, the IIED claim is not based simply on allegations underlying the usurpation of infant's remains claim, but also based on T.W.'s placement, the failure to adequately supervise him, and the alleged retaliation against Lisa for criticizing Defendants' conduct. (*FAC* ¶¶ 264–265.) Accordingly, the Court finds Plaintiffs have sufficiently alleged the IIED claim.

## V. CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Seal [Doc. 11] and **GRANTS-IN-PART** and **DENIES-IN-PART** the Request for Judicial Notice [Doc. 13-2]. The Court also **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motion to dismiss [Doc. 13] and **ORDERS** the ninth cause of action **DISMISSED** against Defendant Durham, and the eighth cause of action **DISMISSED** in its entirety **WITHOUT LEAVE TO AMEND**.

IT IS SO ORDERED.

Dated: November 30, 2020

Hon. Thomas J. Whelan
United States District Judge

29